Thomas J. Eastmond – State Bar No. 211591
Ryan S. Riddles – State Bar No. 298745
GOE & FORSYTHE, LLP
18101 Von Karman Avenue, Suite 1200
Irvine, CA 92612
teastmond@goeforlaw.com
rriddles@goeforlaw.com

Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Counsel for Riley's American
Heritage Farms and James Patrick Riley

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| RILEY'S AMERICAN HERITAGE FARMS, a California corporation; JAMES PATRICK RILEY, an individual, | Case No. 2:18-cv-8817 |
| Plaintiffs, | |
| v. | **COMPLAINT FOR:** |
| CLAREMONT UNIFIED SCHOOL DISTRICT, a California school district; JAMES ELSASSER, an individual; STEVEN LLANUSA, an individual; HILARY LACONTE, an individual; BETH BINGHAM, an individual; NANCY TRESER OSGOOD, an individual; DAVID S. NEMER, an individual; ANN O'CONNOR, an individual; and BRENDA HAMLETT, an individual, | 1. **Violation of Civil Rights – First and Fourteenth Amendments (42 U.S.C. § 1983)** <br> 2. **Conspiracy to Violate Civil Rights – First and Fourteenth Amendments (42 U.S.C. § 1983)** <br> 3. **Injunctive Relief (42 U.S.C. § 1983)** |
| Defendants. | |

Plaintiffs Riley's American Heritage Farms, a California corporation doing business as "Colonial Chesterfield at Riley's Farm" and "Riley's Farm" ("Riley's Farm" or "the Farm"), and James Patrick Riley, an individual ("Mr. Riley"), for their Complaint herein alleges as follows:

**JURISDICTION, VENUE AND PARTIES**

1.      This is an action brought under 42 U.S.C. §§ 1983 and 1985 to recover damages against the defendants named herein (collectively, "Defendants") for violation of Plaintiffs' right to freedom of speech, guaranteed by the First and Fourteenth Amendments to the United States Constitution.

2.      The jurisdiction of this Court is predicated on 28 U.S.C. §§ 1331 and 1343.

3.      Plaintiff Riley's Farm is, and at all times relevant hereto was, a corporation organized and existing under the laws of the State of California, with its principal place of business in Oak Glen, San Bernardino County, California.

4.      Plaintiff James Patrick Riley is, and at all times relevant hereto was, an individual resident of Oak Glen, San Bernardino County, California.

5.      Defendant Claremont Unified School District (the "District") is, and at all times herein mentioned was, a school district duly organized and existing under the laws of the State of California, with its jurisdiction located entirely within the County of Los Angeles, California. Venue is therefore proper under 28 U.S.C. § 1391(b).

6.      A substantial part of the events giving rise to the instant claims occurred within the County of Los Angeles, California, providing a further basis for venue in this District under 28 U.S.C. § 1391(b).

7.      Defendant James Elsasser ("Elsasser" or the "Superintendent") is, and at all times relevant hereto was, the Superintendent of the District, and a resident of the County of Orange, California.

8.      Defendant Steven Llanusa ("Llanusa") is and at all times relevant hereto was the President of the District's governing Board of Education (the "Board"), and a resident of the County of Los Angeles, California.

9.      Defendant Hilary LaConte ("LaConte") is and at all times relevant hereto was the Vice President of the Board, and a resident of the County of Los Angeles, California.

10.      Defendant Beth Bingham ("Bingham") is and at all times relevant hereto was the Clerk of the Board, and a resident of the County of Los Angeles, California.

11. Defendant Nancy Treser Osgood is and at all times relevant hereto was a member of the Board, and a resident of the County of Los Angeles, California.

12. Defendant David S. Nemer ("Nemer") is and at all times relevant hereto was a member of the Board, and a resident of the County of Los Angeles, California.

13. Defendant Ann O'Connor ("O'Connor") is and at all times relevant hereto was the Principal of Chaparral Elementary School in the District, and a resident of Los Angeles County, California.

14. Defendant Brenda Hamlett ("Hamlett") is and at all times relevant hereto was the Principal of Sumner Danbury Elementary School in the District, and a resident of Los Angeles County, California.

15. The Defendants named herein, other than the District, may be referenced herein as the "Individual Defendants." As set forth in greater detail below, the Individual Defendants are sued in their individual capacities, and also (in connection with Plaintiffs' request for injunctive relief) in their official capacities.

**ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

16. Riley's Farm operates an agritourism business, which it describes as a "living history farm," in the foothills of the San Bernardino Mountains, in the rural community of Oak Glen, San Bernardino County. Its varied business activities include seasonal "U-Pick" apple and other fruit picking, produce sales, pie, pastry, cider, jam and other food sales, historical and other novelty item sales, a seasonal pumpkin patch, a restaurant and tavern, dinner theater events, hosting of corporate, family and associational events, summer "day camp" activities, film and commercial location shooting, historically-themed activities such as tomahawk throwing, candle dipping and archery, and school field trips.

17. Depending on the season, Riley's Farm employs between 28 and 163 full- and part-time workers of diverse backgrounds, with the latter high number being reached during the spring "high season" for school field trips. Riley's Farm and its management and staff often have close, long-lasting personal and professional relationships.

18.     The category of school field trips accounts for approximately half of Riley's Farm's revenues, generating around $2,100,000 in gross revenue in a typical recent year out of total Farm revenues of approximately $4,200,000.  Riley's Farm has been hosting school field trips since 2001.  The trips have proven highly popular, and until this year, patronage has grown steadily to its current level.

19.     Riley's Farm's field trip programs include immersive presentations focused on the American Revolution, the Civil War, American colonial farm life, the California Gold Rush, and the pioneer homesteading history of Oak Glen and the San Gorgonio Pass region.

20.     Of these presentations, the American Revolution presentation is the most popular. A large area of the Riley's Farm premises is landscaped and themed as "Colonial Chesterfield," portraying a New Hampshire village of the 1770s.  A post-and-beam colonial tavern, orchards, a village green, stone walls, a storehouse, and a pillory furnish an authentic period environment. Students are divided into small groups (each typically accompanied by a teacher, aide or volunteer chaperone) and spend the day rotating among "stations" where "living historians" in period dress provide interactive presentations on different aspects of the history of the American Revolution and its time period.

21.     The exact number of stations on any given field trip will typically vary according to the time a school group has available.  Educators occasionally request that specific aspects of American history be included or emphasized, and Riley's Farm's staff generally is able to accommodate those requests.

22.     A typical American Revolution field trip might include the following stations:

- Admiralty Court
- Stamp Act
- Drill
- Quartering Act
- Quill and Ink
- Etiquette
- Games

4

23.    In the "Admiralty Court" station, to take one example, student volunteers are put on "trial" for smuggling, with the presentation, containing a healthy dose of comic relief, highlighting the unfairness of the widely despised British admiralty courts (where the same official effectively served as prosecutor, judge and jury) contrasted with the important rights under the present Constitution of trial by jury before an impartial tribunal.  A true copy of Riley's Farm's "The Admiralty Court" presentation script is attached hereto as **Exhibit 1**.

24.    In another popular station, living historians instruct students in 18th century military drill on the village green, learning the authentic "manual of arms" with sticks for muskets and enthusiastic shouts of "BOOM" for musket volleys.  The students may receive a "soldier's ration" of authentically tough hardtack, cheese, and fruit.  Toward the end of the day, the (now well-trained) small groups may join for a reenactment of a skirmish between "Minutemen" and "Redcoats."

25.    After the skirmish, a presenter (in the character of Patrick Henry or another Revolutionary figure) will typically offer a closing speech, with the aim of summing up the lessons and larger meaning of the Revolutionary period. A true copy of a typical closing speech is attached hereto as **Exhibit 2**, and is excerpted as follows:

> "[P]retty soon you get to go on those buses and cars to that wonderful sweet place called home – where there's food on the table, friends next door, and all the comforts of modern life. But I would like you to ponder for just a moment, all the Americans throughout time, from Bunker Hill to Normandy and beyond…who never got that chance to go home…because they gave their lives…so that we may live in a nation where we can vote, we can be tried by a jury of our peers, where we can speak our minds without fear, we can bear arms, where we can worship as we choose. You live in *that* nation."

> "…Then I would hope and pray you remember, despite her faults, and she does have many, the country that was given to you.  You still live in a very free nation.  They say that liberty is a chain…

> "…and you are the next link in that chain."

26.    Riley's Farm works diligently to present an authentic historical experience in both the content of the presentations and the period detail of the costumes and implements, and strives to avoid anachronism.  The presentations are continuously evolving, with input from educators, formally trained historians, the historical reenactor community, and the public.  Riley's Farm's

staff and management are extremely careful – perhaps even more careful than many full-time educators – to avoid "editorializing," or inserting commentary on contemporary political or cultural issues into their presentations.

27.    The District has been a regular patron of Riley's Farm field trips since 2001, with patronage increasing from two field trips in 2001 to 12 field trips in 2017.  Over the past five years, this existing commercial relationship has generated roughly ten field trips per year.

28.    To Plaintiffs' knowledge, the District does not issue any regulations or policies governing public commentary or social media use by independent contractors providing services to the District, or their owners, employees or management.

29.    Riley's Farm maintains an Internet web site at rileysfarm.com, a Facebook page, and a Twitter account, @rileysfarm76.

30.    Plaintiff James Patrick Riley is one of the principal shareholders of Riley's Farm. Mr. Riley has his own Facebook page and Twitter account, which he uses (the latter account is currently inactive) to keep in touch with a wide circle of family, friends and acquaintances he has accumulated over the years.  He also, on occasion, comments on those accounts on matters of public concern, including matters of politics, religion, and social relations.

31.    Some of his social media posts are carefully and thoughtfully crafted, and quite long.  Others, as may commonly be the case on social media, can be shorter, more one-dimensional, more sharply worded and passionate.  In the particular context of Twitter – especially when an interlocutor becomes sufficiently carried away by indignation at Mr. Riley's generally conservative politics to disparage his age, ethnicity, and gender, frequently with liberal torrents of four-lettered vitriol – his tone may fall even farther below George Will/Hendrik Hertzberg levels.

32.    He has made social media comments, in that latter context, on the following subjects, among others:

/ / /

/ / /

/ / /

- The irony of adult entertainer Stormy Daniels being arrested for indecent contact of patrons during a strip club performance, concurrently with her accusing President Trump of sexual immorality ("What is this country coming to if a girl can't even use her bosoms to smack customers and then sue the president for unwanted sexual advances?");

- The perceived radicalism of certain members of the "Black Lives Matter" political movement, juxtaposed for ironic impact with the radicalism of the ISIS terrorist group;

- The widespread perception that Massachusetts Senator and potential 2020 presidential candidate Elizabeth Warren played up an insubstantial and possibly nonexistent Native American ethnic background for personal and political advantage, in a clumsy act of "cultural appropriation" by a quintessentially plain-vanilla New Englander, which Mr. Riley ridiculed with a send-up of how that sort of person might try to mimic stereotyped Native American folkways;

- An unfavorable comparison of Democratic Senator Kirsten Gillibrand to an ice sculpture at one of her fundraisers;

- A wry observation that "I just realized we may have been the last generation born with only two genders"; and

- An expression of contempt for "white supremacy," and what Mr. Riley deemed inordinate fear of it, as being little more significant than "3 guys who live in two different counties in Arkansas," whereas "black supremacy," as exemplified by Louis Farrakhan and sometimes given voice and sympathy by more mainstream public figures, purportedly warrants greater concern.

33.    All of the above comments (the "Commentary") address matters of widespread public concern.

34.    All of Mr. Riley's comments on the above matters were made on his personal social media accounts.  None of them appeared on Riley's Farm's accounts or web site.  Mr. Riley did not reference the District, Riley's Farm, school field trips, or anything with any

1   connection to the District in the above comments.  The District did not commission, pay for,

2   endorse, express approval of, or otherwise associate itself with Mr. Riley's speech on these

3   matters, expressed in the above social media posts.  No reasonable reader of those posts could

4   possibly interpret them as representing the views of the District or the Individual Defendants.

5       35.     Plaintiffs are not District policymakers, supervisors, official government

6   spokespersons, public safety employees, primary or secondary school teachers, or any other

7   category of person that courts have classified as "quintessentially public servants" potentially

8   subject to heightened governmental restraints on speech that may reasonably be perceived as

9   communicating a government agency's own views.  (See, e.g., *McEvoy v. Spencer*, 124 F.3d 92,

10  103 (2d Cir. 1997); *Locurto v. Giuliani*, 447 F.3d 159, 178-179 (2d Cir. 2006).)[1]

11      36.     In or about August 2018, a private person designated herein as "Conspirator A,"

12  who Plaintiffs are informed and believe is not an employee or official of the District, was

13  angered by the Commentary.  Plaintiffs are currently working to confirm the identity of

14  Conspirator A, and may seek leave of this Court to name him or her as an additional defendant

15  when his or her identity is confirmed.

16      37.     Conspirator A formed a combination with one or more other private persons, who

17  agreed to act in concert to induce public agencies – in particular, the school districts who

18  patronize Riley's Farm's field trip business, including the District – to retaliate against Plaintiffs

19  for Mr. Riley's First Amendment-protected expression.

20      38.     Subsequently, Defendants O'Connor and Hamlett joined Conspirator A, and/or

21  others, and agreed to inflict a wrong against and/or injury upon Plaintiffs by retaliating against

22  them.  Defendants O'Connor and Hamlett committed overt acts in furtherance of a conspiracy to

23  retaliate against Plaintiffs for Mr. Riley's First Amendment-protected expression by prohibiting

24  teachers at Chaparral and Sumner Danbury Elementary Schools, respectively, from patronizing

25  Riley's Farm for school field trips.

26

27  [1] The Second Circuit Court of Appeals has gone perhaps the farthest in tolerating governmental restrictions on speech of public employees and/or independent contractors.  Ninth Circuit

28  authorities are less permissive. (See, e.g., *Godwin v. Rogue Valley Youth Corr. Facility*, 656 Fed. Appx. 874, 875-877 (9th Cir. 2016).)

39.    Conspirator A committed additional overt acts in furtherance of the above-referenced conspiracy by intentionally interfering with Riley's Farm's existing commercial relationships with the District and other school districts, by seeking to induce schools within the District, the District as a whole, and other school districts to retaliate against Plaintiffs.

40.    Plaintiffs are informed and believe and on that basis allege that the Superintendent was informed of, approved of, endorsed and ratified the decision of Defendants O'Connor and Hamlett, as principals of the elementary schools they supervised, to prohibit teachers from patronizing Riley's Farm for field trips.

41.    On September 25, 2018, Plaintiffs caused a letter to be sent to the District, the Superintendent, and all of the members of the Board, alerting them that retaliatory action had been taken against Riley's Farm based on Mr. Riley's expressed opinions, setting forth the legal authorities that demonstrate the illegality of this action, and demanding that the action be remedied.

42.    On October 2, 2018, counsel for the District replied, by its counsel, with a vituperative letter fully endorsing the decision of Defendants O'Connor and Hamlett (and potentially other administrators of other District schools, whom Plaintiffs may seek leave of this Court to name as additional defendants upon confirmation that they took similar actions to those of Defendants O'Connor and Hamlett) to withdraw the schools' longtime patronage of Riley's Farm.

43.    The October 2, 2018 letter expressly cited the Commentary referenced in paragraph 31, above, and asserted that the District was within its rights to withdraw its patronage from Riley's Farm based on their content:  "Nothing in the First Amendment obligates the District to continue doing business with any individual or organization that makes public statements which are inimical to the District's educational mission…The District has…no obligation to expose children to an individual who engages in these crude and tasteless comments."

44.    In the October 2, 2018 letter, the District insinuated (without evidence, and indeed contrary to evidence) that its action was necessary to "secure and protect" students from

"discrimination and harassment" and to avoid "expos[ing] them to inappropriate sexist or racist attitudes" or "sexually explicit, indecent or lewd speech."

45. Notably, the District did not assert (nor could it assert, consistent with obligations of honesty) that any of the Commentary, or any comments resembling it, or addressing the same subjects, was ever expressed, or was likely to be expressed, at field trips at Riley's Farm. Students are not, in fact, exposed to "discrimination and harassment, "inappropriate sexist or racist attitudes," or "sexually explicit, indecent or lewd speech" on Riley's Farm field trips. District schoolteachers have attended these field trips for nearly two decades, and (to Plaintiffs' knowledge) have never expressed a single complaint about any such matters.

46. By the October 2, 2018 letter, which Plaintiffs are informed and believe and on that basis allege was approved by Defendants Llanusa, LaConte, Bingham, Osgood, and Nemer, who constitute the District's final policymaking authority, the District ratified, approved and endorsed the unconstitutional actions of Elsasser, O'Connor, and Hamlett, subjecting the District itself to liability for the constitutional violations.

47. In the alternative, Plaintiffs allege that the Superintendent had final policymaking authority for the District, and either contemporaneously or subsequently ratified the actions of Defendants O'Connor and Hamlett.

## **FIRST CLAIM FOR RELIEF**

### **(Violation of the First Amendment – Retaliation – 42 U.S.C. § 1983 – Damages)**

#### *(Against All Defendants)*

48. Plaintiffs re-allege and incorporate by this reference the allegations contained in Paragraphs 1 through 46, or in the alternative Paragraphs 1 through 45 and 47.

49. The First Amendment to the United States Constitution prohibits abridgement of the freedom of speech, and the First Amendment is incorporated against the states by the Fourteenth Amendment. Persons violating the First Amendment under color of law are liable at law and in equity under 42 U.S.C. section 1983.

50. The Individual Defendants, as to this claim for relief, are sued in their individual capacities.

51.     With certain exceptions not applicable here, public agencies may not take adverse action against citizens, including public employees and independent contractors with pre-existing commercial relationships with the agencies, based on speech or expression by those persons which the agencies or their officials or employees disagree with.

52.     In or about September 2018, Defendants Elsasser, O'Connor and Hamlett, acting under color of state law, violated Plaintiffs' clearly established rights under the First Amendment by retaliating against Mr. Riley's constitutionally protected speech.

53.     Defendants the District, Llanusa, LaConte, Bingham, Osgood, and Nemer joined the above-referenced Defendants in violating Plaintiffs' clearly established rights by ratifying, endorsing and approving, on or about October 2, 2018, the above-referenced Defendants' acts in violation of Plaintiffs' clearly established rights.  Such defendants thereby established a District policy to violate those rights in that manner.

54.     No applicable legal precedent could justify the District's retaliation against Plaintiffs based on expression of opinions by Mr. Riley, on matters of significant and widespread public concern, that (1) did not reference the District, Riley's Farm, school field trips, or anything with any connection to the District; (2) was not commissioned, paid for, endorsed, approved, or otherwise associated with the District; (3) was made on Mr. Riley's own time, on his own social media accounts; and which (4) no reasonable reader of those posts could possibly interpret as representing the views of the District or the Individual Defendants.  As set forth above, Plaintiffs are not District policymakers, supervisors, official government spokespersons, public safety employees, primary or secondary school teachers, or any other category of person that courts have classified as "quintessentially public servants" potentially subject to heightened governmental restraints on speech that may reasonably be perceived as communicating a government agency's own views.  While legitimate government concerns to avoid disruption to provision of public services may, in some circumstances, outweigh the interest of an employee or public contractor in freedom of speech, the "more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made."  (See *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 930 (9th Cir. 2004).) Under no applicable legal precedent could the

1  District assert that retaliating against Mr. Riley's speech was actually necessary to avoid
2  disruption to its ability to provide public services sufficient to justify the infringement of
3  Plaintiffs' First Amendment rights.

4       55.    In acting as alleged herein, the Individual Defendants acted knowingly, willfully,
5  and maliciously, and with reckless and callous disregard for Plaintiffs' clearly established and
6  constitutionally protected rights, justifying an award of punitive damages in an amount sufficient
7  to punish the Individual Defendants and discourage others from engaging in similar gross abuse
8  of the public trust and governmental power.

9       56.    As a direct and proximate result of Defendants' actions, as described in this
10  Complaint, Plaintiffs have suffered injury, loss and damage, including but not limited to the
11  following:

12          • Cancellation by District schools of field trips booked for the 2018-2019 school
13             year;

14          • Lost future revenues and/or profits due to the District's unlawful blacklisting of
15             Riley's Farm, notwithstanding that Plaintiffs are informed and believe that
16             District schoolteachers, if not restrained by the District and/or otherwise
17             discouraged by the District's unlawful actions, would continue the pre-existing
18             commercial relationship with Riley's Farm, in an amount subject to proof at trial
19             but not less than $125,000;

20          • Reputational damage to Mr. Riley and Riley's Farm, in an amount subject to
21             proof at trial, in excess of $125,000; and

22          • Mental and emotional distress, mortification, worry, anguish, and embarrassment,
23             including the effects of anxiety over Riley's Farm's future ability to continue to
24             provide livelihoods for its loyal longtime employees with whom Mr. Riley and
25             Riley's Farm management have significant personal relationships and feel a sense
26             of obligation to, in an amount subject to proof at trial, not less than $800,000.

27  ///
28  ///

### SECOND CLAIM FOR RELIEF

### (Violation of the First Amendment – Conspiracy – 42 U.S.C. § 1983 – Damages)

### *(Against Elsasser, Llanusa, LaConte, Bingham, Osgood, Nemer, O'Connor, and Hamlett)*

57.    Plaintiffs re-allege and incorporate by this reference the allegations contained in Paragraphs 1 through 46, or in the alternative Paragraphs 1 through 45 and 47, together with Paragraphs 49 through 56.

58.    As set forth above, Conspirator A, other private persons, O'Connor, Hamlett, Elsasser, Llanusa, LaConte, Bingham, Osgood, and Nemer conspired and agreed together to inflict injury upon Plaintiffs, by procuring and causing official governmental retaliation against them for Mr. Riley's First Amendment-protected expression on matters of public concern.

59.    Overt acts taken in furtherance of this conspiracy include, but are not limited to, (1) Conspirator A's successful efforts to induce one or more of the Individual Defendants to end Riley's Farm's pre-existing commercial relationship with the District; and (2) the Individual Defendants' unlawful cessation of patronage of Riley's Farm for school field trips based on unconstitutional conditions.

60.    As set forth above, Conspirator A has also undertaken to induce other school districts to take similar unlawful retaliatory action against Riley's Farm.  To date, at least four other school districts have indicated that they intend to follow the District's example.

61.    Plaintiffs are informed and believe, and on that basis allege, that one or more of the Individual Defendants have taken further overt action in furtherance of the conspiracy, by contacting officials at other school districts and encouraging them to join the District in retaliating against Riley's Farm.  The Individual Defendants' actions in furtherance of the conspiracy have a contagious effect, magnifying the impact of the conspiracy well beyond the boundaries of the District itself.

62.    The overt acts of the Individual Defendants, Conspirator A, and potentially other participants in the conspiracy (which Plaintiffs may seek leave of Court to add as defendants, as may be appropriate) have resulted in damage to Plaintiffs, which continues to mount.  Riley's Farm has lost a significant amount of its field trip business as of the date of the filing of this

Complaint.  Riley's Farm reasonably anticipates that (as the spring field trip high season approaches, and more school districts get around to formally approving field trips and the associated payments), it may have lost from 33% to 50% of its $2,100,000 field trip business.

63.    As a direct and proximate result of Defendants' actions in furtherance of the above-referenced conspiracy, as described in this Complaint, Plaintiffs have suffered injury, including but not limited to:

- Cancellation by District schools of field trips booked for the 2018-2019 school year;

- Lost future revenues and/or profits due to the District's unlawful blacklisting of Riley's Farm, notwithstanding that Plaintiffs are informed and believe that District schoolteachers, if not restrained by the District and/or otherwise discouraged by the District's unlawful actions, would continue the pre-existing commercial relationship with Riley's Farm, in an amount subject to proof at trial but not less than $125,000;

- Reputational damage to Mr. Riley and Riley's Farm, in an amount subject to proof at trial, in excess of $125,000;

- Mental and emotional distress, mortification, anguish, and embarrassment, including the effects of anxiety over Riley's Farm's future ability to continue to provide livelihoods for its loyal longtime employees with whom Mr. Riley and Riley's Farm management have significant personal relationships, in an amount subject to proof at trial, not less than $800,000;

- Lost future revenues and/or profits from lost business with other school districts, lost as a direct and proximate result of the general conspiracy in which the Individual Defendants, together with Conspirator A, are participants, in a sum reflecting up to the value of 50% of Riley's Farm's reasonably foreseeable total future school field trip business absent Defendants' unlawful action, in an amount subject to proof but likely in excess of $9,875,000.

/ / /

64.     In acting as alleged herein, the Individual Defendants acted knowingly, willfully, and maliciously, and with reckless and callous disregard for Plaintiffs' clearly established and constitutionally protected rights, justifying an award of punitive damages in an amount sufficient to punish the Individual Defendants and discourage others from engaging in similar gross abuse of the public trust and governmental power.

### THIRD CLAIM FOR RELIEF

### (Injunctive Relief – 42 U.S.C. § 1983)

*(Against All Defendants)*

65.     Plaintiffs re-allege and incorporate by this reference the allegations contained in Paragraphs 1 through 46, or in the alternative Paragraphs 1 through 45 and 47

66.     This claim for relief is alleged against the District, and against the Individual Defendants in their official capacities.

67.     As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer extreme hardship and actual and impending irreparable injury, loss, damage in that Plaintiffs are informed and believes and thereon alleges that Defendants' policy to prohibit District schools from patronizing Riley's Farm for field trips, as Plaintiffs are informed and believe and on that basis allege certain schoolteachers wish to continue to do, is continuing.

68.     Plaintiffs allege, in the alternative to the allegations contained in Paragraphs 1 through 46, or in the alternative Paragraphs 1 through 45 and 47, together with Paragraphs 49 through 64, that Plaintiffs have no adequate or speedy remedy at law for the conduct of Defendants described above. This action for injunctive relief is Plaintiffs' only means of securing prospective relief, preventing further and continuing retaliation against Plaintiffs based on the Commentary and/or future First Amendment-protected commentary by one or more of Plaintiffs.

/ / /

/ / /

/ / /

/ / /

/ / /

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

**On the First Claim for Relief**

*Against the District*:

1.  For compensatory damages, in an amount subject to proof at trial, in excess of $1,050,000;

2.  For reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988;

3.  For costs of suit incurred in this action; and

4.  For such other and further relief as the Court deems proper.

*Against Elsasser, Llanusa, LaConte, Bingham, Osgood, Nemer, O'Connor, and Hamlett, in their individual capacities:*

1.  For the above-referenced relief, and

2.  For punitive damages, in an amount to be determined according to proof at trial, sufficient to punish Defendants and make an example of them for their abuse of the public trust and governmental power, not exceeding ten times Plaintiffs' general damages.

**On the Second Claim for Relief**

*Against Elsasser, Llanusa, LaConte, Bingham, Osgood, Nemer, O'Connor, and Hamlett, in their individual capacities:*

1.  For compensatory damages, in an amount subject to proof at trial, in excess of $10,975,000;

2.  For reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988;

3.  For costs of suit incurred in this action;

4.   For punitive damages, in an amount subject to proof at trial to be sufficient to punish Defendants and make an example of them, not exceeding ten times Plaintiffs' general damages, and

5.  For such other and further relief as the Court deems proper.

/ / /

### On the Third Claim for Relief

*Against the District and the Individual Defendants in their official capacities:*

1.  For a preliminary and permanent injunction enjoining and restraining the District, and/or Elsasser, Llanusa, LaConte, Bingham, Osgood, and Nemer, and their successors in office, from maintaining, enforcing or adopting any policy, custom or practice to forbid or discourage patronage of Riley's Farm by District schools or employees, for field trips or any other purpose, or of any other independent contractor with a commercial relationship with the District as of the date of the filing of this Complaint, due to private commentary by any of its owners, officials or employees, not expressed in the immediate context of field trip presentations, about matters of public concern.

2.  For a preliminary and permanent injunction enjoining and restraining the District, and/or Elsasser, Llanusa, LaConte, Bingham, Osgood, and Nemer, and their successors in office, from encouraging or permitting employees or officials of the District to withdraw patronage from Riley's Farm, or any other independent contractor with a commercial relationship with the District as of the date of the filing of this Complaint, due to private commentary by any of its owners, officials or employees, not expressed in the immediate context of field trip presentations, about matters of public concern.

3.  For a preliminary and permanent injunction enjoining and restraining O'Connor and Hamlett, and their successors as principals of Chaparral and Sumner Danbury Elementary Schools (respectively) from maintaining, enforcing or adopting any policy, custom or practice to forbid or discourage patronage of Riley's Farm by any teachers or employees of the schools they supervise as principals, for field trips or any other purpose, or of any other independent contractor with a commercial relationship with the District as of the date of the filing of this Complaint, due to private commentary by any of its owners, officials or employees, not expressed in the immediate context of field trip presentations, about matters of public concern.

4. For a preliminary and permanent injunction requiring the District to formally apologize to Plaintiffs for violating their First Amendment rights, acknowledge the District's wrongdoing, and acknowledge its obligation to respect freedom of speech, in a suitable form to be prepared by counsel for Plaintiffs, in order to limit, insofar as it is possible, further reputational harm to Plaintiffs;

5. For reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988;

6. For costs of suit incurred in this action; and

7. For such other and further relief as the Court deems proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a trial by jury.

Date: October 12, 2018                    **GOE & FORSYTHE, LLP**


                                          By:/s/*Thomas J. Eastmond*
                                             Thomas J. Eastmond
                                             Counsel for Plaintiffs Riley's American
                                             Heritage Farms and James Patrick Riley

# EXHIBIT 1

# EXHIBIT 1

# <u>The Admiralty Court</u>

Invite all of the township members into an area that allows them to sit down and face a central chair and table, inside a building or within a covered tent with walls. As the guests enter the court room, ask the Teacher to give you the name of a fun-loving, outgoing young lady to serve the role of the guilty party. Direct them to remain outside with you as the others enter the court room. Also, delegate any adult as the bailiff and provide them the Bailiff Script. They are to read the card with as much authority and volume as is appropriate.

(Prompt the Bailiff to read his/her lines. Enter the courtroom and sit behind the table as soon as your adult volunteer finishes reading.)

<u>Auchmuty</u>: You may be seated. (Pause, shuffling papers, preparing the inkpot, etc. The royal proceedings of this Vice Admiralty court are now in session.

(Bang the gavel assertively to gain the student's rapt attention).

<u>Auchmuty</u>: To be resolved and concluded in the name of the Lords of Admiralty: In the matter of smuggling, private citizen (scholar chosen by Teacher) is hereby accused of violation of His Majesty's Iron Act of 1750, procuring and transporting forged iron goods into British Colonies, without bearing proper Mark of Origin. Is private citizen (the accused) present? Rise if you are present.

<u>Accused</u>: Aye (Yes, etc.)

<u>Auchmuty</u>: You will step forward and be seated before the court.

Two years ago, you were seen boarding the vessel, The Liberty, with a trunk full of finished iron goods. It was determined by the authorities at that time that you were a smuggler, in direct violation of His Majesty's Iron Act of 1750. You were arrested, your goods were seized. You and your goods have remained in custody this last two years. Today you are being formally charged. How do you plead? Innocent, or Guilty? (Emphasize Innocent a bit louder, prompting the student to choose the former. If the student does plead Guilty, respond with, Very well, we will continue this hearing merely for the purpose of sentencing the accused.")

<u>Accused</u>: Innocent.

<u>Auchmuty</u>: As Vice Admiralty Court Judge, I must inform you that you may not simply state your innocence, you must PROVE your innocence….how do you intend to do so?

<u>Accused</u>: ….Uh…..um…..

<u>Auchmuty</u>: You will be allowed to call one witness to testify on your behalf.

(If needed, whisper that the accused can call one of their friends from the class.)

<u>Accused</u>: Aye, I wish to call (names a friend in the class).

<u>Auchmuty</u>: (to student named by the accused) You will step forward and be seated. The Court will now take the liberty of calling its own witnesses to counter the testimony of this witness. (Pick two students with their hands raised, as always try to balance out boys and girls together. If no one raises their hand, have the teacher pick two volunteers.) You, and  you….come forward. You will be seated as witnesses One and Two. When summoned, you will approach the podium and give testimony AGAINST the accused. The Vice Admiralty Court hereby summons Witness One. Witness One, rise and approach the podium (motion Witness One toward the podium, if necessary). State your name (pretend to jot things down with a quill). Very well, (student's name), give your testimony.

<u>Witness One</u>: I saw the accused boarding our vessel, with a  trunk of finished iron goods, sir.

<u>Auchmuty</u>: I see, so you actually WITNESSED this one (motion toward the accused) boarding your vessel, with contraband in her possession?

<u>Witness One</u>: Aye

<u>Auchmuty</u>: I see. Did the contraband she carried aboard your ship resemble this? (hold up iron hinge in a non-threatening way)

<u>Witness One</u>: Aye.

<u>Auchmuty</u>: And you have used the collective, possessive term, "Our vessel". Am I to understand you are the captain?

<u>Witness One</u>: Aye (if they answer otherwise, interrogate them as to their role on the ship, Owner, First Mate, etc…)

Auchmuty: Ah, very well, the captain. Are you a good captain?

<u>Witness One</u>: Aye

<u>Auchmuty</u>: I would trust even as a mediocre captain, you would know of everything that goes on aboard your vessel?

<u>Witness One</u>: Aye

<u>Auchmuty</u>: I see. In finality, I would like you to point to the accused…

(Witness One should point to the accused. If they are confused, and point elsewhere, just comedically remind them by pointing that the accused is OVER THERE)

Very well, be seated (motion them back to the witness stand).

(To the accused) You have an eyewitness, who has SEEN you smuggling…this is looking rather grim.

Witness Two, come forward! State your name…(repeat process from Witness One)

Witness Two: The accused knew me to be a person familiar with her smuggling habits, your honor, she offered me two pounds not to testify.

Auchmuty: (Insulted) You mean to assert that this one (motion to accused) attempted to BRIBE you, so you would not testify against her in MY court?

Witness Two: Aye, sir.

Auchmuty: : (Irate now) A two pound BRIBE, not to testify in MY court?!? (To Accused) You cannot BRIBE witnesses! I am hereby adding bribery to your charges. How do you plead, Guilty, or Not Innocent?

(However the Accused replies, simply speak over them…) I thought as much.

{this bracketed selection is optional…

 Have you stopped bribing people?

(Either way the accused answers, they are guilty by their own admission. i.e. "You have not stopped bribing citizens? By your own admission, you are guilty of bribery." Or, "You have stopped? Well, in order to STOP bribing citizens, you must have STARTED bribing at some point. You are now guilty by your own admission of bribing in the past.")}


(To Witness Two) Witness Two, you seem a polite chap/lass…and I notice you've dressed in your finery this day (give a skeptical look up and down the witness), including a LOVELY pair of shoes. I would estimate their cost at about two pounds. Did you accept the illegal bribe?

Witness Two: No.

Auchmuty: Are you certain?

Witness Two: Yes

<u>Auchmuty</u>: (Incredulously)You TOOK the bribe?

<u>Witness Two</u>: NO

<u>Auchmuty</u>: Which is it, did you or did you not take the illegal bribe?

<u>Witness Two</u>: I did not, your honor.

<u>Auchmuty</u>: So, you're positively declaring that you did not, in fact not deny NOT taking the bribe?

<u>Witness Two</u>: (student should be thoroughly confused at this point. Either way they answer….)

<u>Auchmuty</u>: YOU TOOK THE BRIBE?

Witness Two: No! I did NOT take the bribe!

(Class should be laughing heartily by now, and student should be nervous and befuddled, but if they do answer that they did take the bribe, find them guilty, bang the gavel, then direct them to stand with the accused.)

Auchmuty: I see, you may be seated. (To accused) You have an eyewitness AND a new crime against you…I certainly hope you have exercised wisdom in selecting YOUR witness. Witness Three, to the podium!

(Repeat process of having them state their name and jotting notes. If appropriate, you may mutter under your breath that their name is a French name, for a bit more bias and comedy.)

<u>Witness Three</u>: Well, judge, the acc…

Auchmuty: (Cut the witness off abruptly) Ahem! You will NOT address me as 'judge', you will address this court as 'Sir', or 'Your Honor.' I find you in contempt of court and you will be fined fifty pound. (bang the gavel). Carry on.

(If the witness again does not address you properly, you may interrupt them again and fine them 100 pounds.)

<u>Witness Three</u>: The accused cannot possibly be guilty, for she was in my company, loading the trade ship, The Scurvy Dog, on the 24th of August, two years ago.

<u>Auchmuty</u>: My, that seems a compelling testimony. First, you mentioned that she could not POSSIBLY be guilty, for she was in YOUR company on the date of the crime? Is that so?

<u>Witness Three</u>: Yes

<u>Auchmuty</u>: I see…thereby not smuggling…and the date of the crime you mentioned, was the 24th of WHICH month?

<u>Witness Three</u>: August

<u>Auchmuty</u>: Interesting. You see, the date of the crime, of which SHE is accused, was in fact the 24th of MAY…not August…rendering your testimony IRRELEVANT! You have not proven innocence for the accused.

(Pause)

However, you mentioned that on that fateful day in August, both you AND the accused were loading the trade ship….What was the name of that vessel?

<u>Witness Three</u>: The Scurvy Dog (help the witness if they are confused or stuck)

<u>Auchmuty</u>: The Scurvy Dog! Which I do recognize…as the most wanted PIRATING vessel in all of these waters! Loading a pirate ship, were we? I would say that makes you a pirate. Are you a pirate?

Witness Three: No (If yes, then find them guilty of piracy and place them with the accused.)

Auchmuty: Oh, you're not a pirate? You just simply wander about, innocently loading PIRATING vessels…I don't believe you. You will PROVE to me you are not a pirate. Are you educated?

Witness Three: Yes

Auchmuty: You know your alphabet, then?

Witness Three: Yes

Auchmuty: I see. Since pirates are not educated, never been to an academy…you will PROVE to me you are not a pirate, by telling me, in your alphabet, which letter comes after…..(pause as though you are picking a random letter)…Q?

Witness Three: R? (make them repeat it a few times, as though you are struggling to hear them)

Auchmuty: YOU ARE a pirate!! GUILTY (bang the gavel)! Over there! (again, direct them to stand with the accused.)

(to accused) Now, as for you…Since you have not satisfactorily proven your innocence on the charge of smuggling, I hereby find you guilty of violating His Majesty's Trade and Navigation Acts. (Bang the gavel sharply.) Since you have been implicated by your own witness in Piracy aboard the Scurvy Dog and offered no proof otherwise, you are hereby guilty of Piracy. (Bang the gavel again.) Finally, by your own admission, I hereby find you guilty of Bribing a Witness. Have you anything final to offer in your own defense? (Pause very briefly, but do not allow even one word from the accused. Cut them off and proceed with…) I didn't think so. In light of your guilty verdict, I shall decide your sentences in a moment, as I have additional questions for these two/this one. (Recall any witnesses that remain in order, and find them guilty)

(to Witness One) You said something interesting a moment ago: (repeat verbatim their testimony as quickly as possible, attempting to confuse them. When they agree, continue) Does this not strike you as a bit odd? A bit strange? That she was SMUGGLING forged iron aboard YOUR vessel, and as Captain/Owner/First Mate, you KNEW about this? For two years? And you did nothing? There is a word for that…it is called being an ACCOMPLICE. You are guilty of being an accomplice! (bang gavel) Over there!

Now then, this brings us to Witness Two (direct them back to the podium)

You said a moment ago, that you had taken the bribe, bought some splendid shoes, and giggled all the way home…isn't that so? Oh, come now, you look guilty. You'll feel much better if you admit it. All these people are waiting for you, just admit it…you took the bribe, didn't you, didn't you, didn't you, DIDN'T YOU?

(generally harangue the witness until they admit it, or they stalwartly deny doing so. If they opt the latter, continue by directing them to approach the bench for a recreation of the events in question).

I see, well, I require further knowledge regarding the events in question. We will re-create the event. Approach the bench. Now then, you will imagine as though you are the accused, and I am you. This will serve as the two pounds she attempted to give you (hand the student two shillings). I would like you to show me HOW she attempted to bribe you. Did she say, "Here, take the money.."? SHOW me what happened. (Hold your hand directly out so that the student may place the shillings in your hand. When they do, find them guilty of bribing a judge and dismiss them. If they do not, find them guilty of obstructing justice and dismiss them.

(Now that all witnesses have been found guilty, address them all)

As for all of your sentencing, you will each receive a five hundred pound fine, per offense. If you cannot pay, your worldly goods will be seized by the King's Guard, and sold at public venue. Five percent will be paid directly to me to act as incentive to root out traitors to the crown. These proceedings are hereby closed and this court is now adjourned. Bailiff, take them into custody!! (Bang the gavel with finality)

Now then, for each of you guilty parties, you will not in fact be fined, but quite the opposite. You are each to be awarded two shillings a piece. (Award the shillings and have the class applaud them)

Now then, I will also be awarding this fine stack of shillings to anyone who can answer my questions, by raising their hand. First, however, I would very much like to hear YOUR opinion on something. What you've witnessed here this day is a recreation of what might have transpired in the Admiralty Courts of 1775. We will discuss the differences between this court system and the one you have established in your own present day, but first, a question: I wish your opinion in this matter. Did you consider this to be a fair court proceeding? Aye or Nay?

Students: NAY!

Presenter: I would hope you didn't think this was a fair trial. This, in fact, was a VERY unfair trial. It was SO unfair, that if it were to occur in your modern court system, this would be a gross, and MASSIVE violation of your rights! We will discuss your court system, and then compare them to what you have seen here this day. First, tell me, who is the person who sits behind the bench, dressed in black robes, and wields the gavel?

(Call on one scholar with a raised hand and award one shilling to the one who gives 'judge' as an answer)

Presenter: Very well, and what is the decision that the judge must reach by the end of the court session?

(Almost all scholars reply with the incorrect answer of 'Guilty or Innocent'. Do not simply say, 'No', but respond with:)

Presenter: (to the scholar who guessed incorrectly), Almost everyone guesses this, but this is not accurate. (Now, to everyone, *remembering the one who gave the incorrect response*.) In all but your bench trials, your judges do NOT decide whether or not you have committed the crime, but…what is it that your judges decide?

(Now many hands will be raised with the correct answer: Sentence, Punishment, Fine, If you go to jail, etc. Accept any of these and award one shilling.)

Presenter: That is correct. It is the SENTENCE, the punishment, that your judge decides, NOT the verdict, but the sentence. And on that topic, there are twelve people sitting in a box to the side, listening to the whole affair…what are they called?

(Someone will be very forthcoming with, "Jury". Accept and award one shilling.)

Presenter: Very well, and what is the jury's decision that they must make at the end of the court proceedings? (Now, smile and look directly at the scholar who gave the incorrect answer a moment ago and continue with,) Now is your chance…..

(Nod along with their attempts and prompt them with clues if necessary, but most will smile sheepishly and produce the answer of 'Guilty or Innocent'.)

Presenter: Indeed, it is Guilty or Not Guilty, and that decision is called the Verdict (have the class repeat this).

It is the JURY, not the judge, who decides your verdict. Very important distinction here… It is that jury, those twelve citizens chosen at random, your peers, that decide your fate. NOT a professional judge. And now, there are two more individuals going about the court. They share the same profession, but are trying to prove two different things. One is trying to prove you innocent, the other is trying to prove you guilty. It is a very highly paid profession with much responsibility, and it begins with the letter 'L', who are these people?

(Accept 'Lawyer' and award one shilling.)

Presenter: Indeed, a lawyer. However in the courtroom, they are properly addressed as an 'Attorney' (again have the class repeat). There are dozens of different kinds of attorneys, but the two that you find in a criminal proceeding typically…well, one of them is trying to prove guilt upon the accused…and this is known as a Prosecuting Attorney (class repeats).

Excellent, a Prosecuting Attorney. And the other, the one attempting to prove Not Guilty upon the accused…what is this Defending Attorney called?

(Same as above, but accept Defender, Defense, Defending Attorney….but NOT Defendant, as that is another name for the accused.)

Very well done, a Defending Attorney.

Now, let's do some finger pointing. I would like you all to point at who you thought the judge was, in this court here today. (Most will point to you. Nod and agree…) Indeed, it was me. I was the judge. Now, was there a jury here this day? If so, point to that jury. (Many will point to the witnesses, to themselves, etc. To each, point and ask,) Did they decide the verdict? Did you decide the verdict? Nay indeed, I decided the verdict, therefore I was the….

Scholars: Jury.

Presenter: Correct, I was the Judge AND the Jury. And who was the Prosecuting Attorney, who was the one trying to find them guilty? (Some will begin to catch on and point to you again.) Correct, I was trying to prove the accused guilty, therefore, I was indeed the Prosecuting Attorney. Now, does it seem fair that I was the Judge, the Jury, AND the Prosecuting Attorney? Is it fair that I get to accuse someone, try to prove them guilty, decide they are guilty, and then punish them too? (Pause, allowing the scholars to

say no.) HEAVENS NO, that is not fair. If you were on trial for any crime, would you want only one person deciding your fate? (Again pause and allow a negative reply.) It is much more fair to have more people making those decisions, which brings us to the big question of the hour…For THREE shillings now (pause while they all stare, wide-eyed at such a boon,) WHY is it better to have more people? They can provide more….what?

(At this point, prompt and coax the response 'Opinions' out of the group. Reward three shillings to the one who gives the reply: opinions, thoughts, perspective, or such.)

This opinion is what you all have a right to, and it is the ONLY one of your freedoms that is unlimited! Our right to free speech, for example, has limits, as we can not enter a crowded building and simply yell "FIRE", as this would be endangering others, and infringing upon their freedoms. Our freedom to think for ourselves is the backbone of a fair trial by jury, and a VERY important freedom!

Very well, scholars, you have been a marvelous township. This concludes our time here together for now…(continue by sending them to their next post.)

If any time remains, you may engage the students in having them raise their hands to tell you of anything they noticed that occurred, that would be illegal in today's courtroom. Coax them by telling them that if it seemed unfair or wrong, chances are it would be against the law today. Children tend to have a very keen and powerful sense of fair play, and really delight in this opportunity.

You may discuss:

Leading the witness
Badgering the witness
Lack of evidence
Innocent until proven guilty
Finding witnesses guilty
Accusing witnesses of crimes
Adding charges during a trial
Entrapment
Excessive punishment
Lack of defense

All of these went on in our demonstration today.

# EXHIBIT 2

# EXHIBIT 2

# Closing Speech – RW

On behalf of all of us here at Riley's Farm, I'd like to thank you all for taking part in our humble recreation of history. I say humble because I will be the first to admit that it might seem a bit silly to be walking around in a field with a stick, yelling, 'Boom.' But what you just took part in was a grand old American tradition, older than the Republic herself. The minute companies and militias would gather on the parade ground green eight times a year, sometimes from the age of small boys, and they would practice the discipline of war. They did not do that because they loved war. Quite the contrary, they loved peace. They loved their homes, their families, their meeting houses, their livelihoods, and perhaps like few generations in the history of this entire world, they loved their liberty, and they were willing to fight and die to protect it.

They knew well the difficulties of war, and the horrors it brings with it: pain, misery, loneliness and death. Abigail Adams, the wife of our second president, lost five of her dearest loved ones in one summer, due to the sickness that was in the camps around Boston. They knew the price of war, yet they were willing to pay it. John Adams wrote, "We do this thing for generations yet unborn." Who is that? That is all of you, and your children.

There's a story that has always touched me, and I pray you'll pay attention to it for just a moment. There was a young man named Sergeant McDonald who came to America for a better life. Like most Americans he came from immigrant stock. Young Sergeant McDonald was fighting for his new country, not his old one, and found himself in a very bad spot. He stood atop Fort Moultrie, in South Carolina, during a very dismal hour of the American Revolution. A British gun ship, a great Man o' War pulled into the harbor, opened up her gun ports, and began blasting cannonball into that fort. One of those cannonballs hit Sergeant McDonald right across the belly. It removed his stomach entirely, knocked him to the ground and took his life. In those closing seconds of his young life, he said something to his friends that they never forgot…even when they were old men. And I hope you never forget. He didn't ask for comfort; he asked for one thing: he said, "Lads…don't let liberty…die with me."

Scholars, thirty one years ago, almost to the day 241 American servicemen lost their lives in one bombing attack in Lebanon, while in their beds. On nearby Navy vessels, volunteers were called forward to go in and help clean up, despite the presence of snipers. One of those men is here today, among your numbers.

Scholars, if you don't remember anything about your time spent here today – the funny clothes, the strange Americans…and there still are Americans of every sort… who love all of you… and what you believe in…enough to give their lives.

I know we didn't feed you very well today, and you might be a bit hungry, tired or bored listening to me, sitting here in this field, but pretty soon you get to go on those buses and cars to that wonderful sweet place called home – where there's food on the table, friends next door, and all the comforts of modern life. But I would like you to ponder for just a moment, all the Americans throughout time, from Bunker Hill to Normandy and beyond…who never got that chance to go home…because they gave their lives… so that we may live in a nation where we can vote, we can be tried by a jury of our peers, where we can speak our minds without fear, we can bear arms, where we can worship as we choose. You live in *that* nation.

I'll take a moment and remind you, that there are perhaps scores of thousands of people on planet earth right now, that would trade anything they have, just to be sitting where you're sitting right now. Scholars, did you know there are places in the world right now, where a woman can't even drive a car, much less vote. Is that the country you want to give your children?

There are places in the world where tonight, poor souls will go to bed behind barbed wire fences, out in open fields, freezing in the cold and starving until they die, just because they said something their government didn't like. Is that the country you want to give your children? Scholars, if you can believe this, there are places in the



world right now, in 2014, where slavery is still a reality for people. Is that the country you want to give your children?

Then I would hope and pray you remember, despite her faults, and she does have many, the country that was given to you. You still live in a very free nation. They say that liberty is a chain….

…and you are the next link in that chain. The freedom of this nation is very much in your hands.

So again, on behalf of all of us here at Riley's Farm, you've been a fine group of scholars, we appreciate your presence, and we look forward to seeing you, your friends and your families again someday soon. Thank you very much.