1  Golnar J. Fozi (Cal. Bar No. 167674)
   Daniel S. Modafferi (Cal. Bar No. 294510)
2  Meyers Fozi & Dwork, LLP
   1808 Aston Avenue, Suite 100
3  Carlsbad, California  92008
   Tel: (760) 444-0039; Fax: (760) 444-0130
4  Email:   gfozi@meyersfozi.com
            dmodafferi@meyersfozi.com
5
   Attorneys for Defendants,
6  James Elsasser, Steven Llanusa, Hilary
   LaConte, Beth Bingham, Nancy Treser
7  Osgood, David Nemer, Ann O'Connor, and
   Brenda Hamlett
8

9              **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

11

12  RILEY'S AMERICAN HERITAGE         **Case No.:  5:18-cv-02185-JGB-SHK**
    FARMS; and JAMES PATRICK          **Assigned to: Hon. Jesus G. Bernal**
13  RILEY,
                                      **MEMORANDUM OF POINTS AND**
14          Plaintiffs,               **AUTHORITIES IN SUPPORT OF**
                                      **DEFENDANTS JAMES ELSASSER,**
15       v.                           **ANN O'CONNOR, AND BRENDA**
                                      **HAMLETT'S MOTION FOR**
16  CLAREMONT UNIFIED SCHOOL          **SUMMARY JUDGMENT OR, IN**
    DISTRICT; JAMES ELSASSER;         **THE ALTERNATIVE, PARTIAL**
17  STEVEN LLANUSA; HILARY            **SUMMARY JUDGMENT**
    LACONTE; BETH BINGHAM;
18  NANCY TRESER OSGOOD; DAVID        **[F.R.C.P. 56]**
    S. NEMER; ANN O'CONNOR; and
19  BRENDA HAMLETT,                   **Date:    July 6, 2020**
                                      **Time:    9:00 a.m.**
20          Defendants.               **Crtrm:  1**

21                                    **Complaint Filed:  October 12, 2018**
22                                    **Trial Date:  September 29, 2020**

23

24

25

26

27

28

                                  1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. 3

I.     INTRODUCTION ..................................................................... 5

II.    SUMMARY OF UNDISPUTED MATERIAL FACTS ........................ 6

    A.   The Parties .................................................................. 6

    B.   Background on CUSD Field Trips .................................... 6

    C.   James Patrick Riley's Online Posts Lead to a Controversy Online.................... 7

    D.   Parents Complain to CUSD about Riley's Farm Field Trips .............. 8

    E.   CUSD Schools Cancel Riley's Farm Field Trips in Response to Parent Complaints.................... 10

    F.   Plaintiffs' Counsel Threatens to Sue, and the District's General Counsel Responds .................... 11

III.   SUMMARY JUDGMENT STANDARD ...................................... 12

IV.    PLAINTIFFS CANNOT PRODUCE EVIDENCE SUFFICIENT TO SUPPORT A PRIMA FACIE CLAIM FOR FIRST AMENDMENT RETALIATION AGAINST THE ADMINISTRATOR DEFENDANTS. 13

    A.   Plaintiffs Cannot Produce Evidence That Any of the Administrator Defendants Intended to Chill James Patrick Riley's Political Speech .............. 14

    B.   Even if Plaintiffs Could Make out a Prima Facie Case That Defendants Were Retaliating against James Patrick Riley's Speech, A Public School's Choices in Designing Its Curriculum – Which Necessarily Includes Choice of Field Trip Venues – Do Not Implicate the First Amendment.................... 16

V.     EVEN IF PLAINTIFFS COULD DEMONSTRATE PRIMA FACIE FIRST AMENDMENT RETALIATION, LEGITIMATE GOVERNMENTAL INTERESTS OUTWEIGH PLAINTIFFS' FIRST AMENDMENT HARM .................... 22

VII.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY, BECAUSE A REASONABLE PUBLIC SCHOOL ADMINISTRATOR IN DEFENDANTS' POSITION COULD HAVE BELIEVED THAT IT WAS LEGAL TO CANCEL THE RILEY'S FARM FIELD TRIPS IN RESPONSE TO PARENT COMPLAINTS..... 25

VIII.  PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES......... 28

IX.    CONCLUSION.................................................................. 29

1

# TABLE OF AUTHORITIES

2 **Cases**

3 *Alpha Energy Savers, Inc. v. Hansen* (9th Cir. 2004) 381 F.3d 917 .................. 22

4 *Amback v. Norwick* (1979) 441 U.S. 68 ................................................................ 16

5 *Anderson v. Creighton* (1987) 483 U.S. 635 ....................................................... 25

6 *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242 ........................................ 12

7 *Arkansas Educational Television Commission v. Forbes* (1998) 523 U.S. 666.. 17

8 *Awabdy v. City of Adelanto* (9th Cir. 2004) 368 F.3d 1062 .............................. 14

9 *Baker v. McCollan* (1979) 443 U.S. 137 ............................................................. 14

10 *Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26 v. Pico* (1982) 457 U.S. 853, 5,
11      19, 22

12 *Boring v. Buncombe County Bd. of Ed.* (4th Cir. 1998) 136 F.3d 364 ............... 18

13 *Celotex Corp. v. Catrett* (1986) 477 U.S. 317 .................................................... 12

14 *Chiras v. Miller* (5th Cir. 2005) 432 F.3d 606 .............................................. 19, 20

15 *Cohen v. California* (1971) 403 U.S. 15 ............................................................. 18

16 *Crumpton v. Gates* (9th Cir. 1991) 947 F.2d 1418 ............................................ 13

17 *Dang v. Cross* (9th Cir. 2005) 422 F.3d 800 ..................................................... 28

18 *Desyllas v. Bernstine* (9th Cir. 2003) 351 F.3d 934 .......................................... 25

19 *Downs v. Los Angeles Unified Sch. Dist.* (9th Cir. 2000) 228 F.3d 1003 .......... 17

20 *Epperson v. State of Arkansas* (1968) 393 U.S. 97 .............................................. 5

21 *Esquivel v. San Francisco Unif. Sch. Dist.* (N.D. Cal. 2008) 630 F.Supp.2d 1055 16

22 *Evans-Marshall v. Board of Education* (6th Cir. 2010) 624 F.3d 332 ............... 18

23 *Fogel v. Collins* (9th Cir. 2008) 531 F.3d 8 ....................................................... 25

24 *Hope v. Pelzer* (2002) 536 U.S. 730 ................................................................... 25

25 *Johnson v. Poway Unified School District* (9th Cir. 2011) 658 F.3d 954 .......... 17

26 *Lowery v. Euverard* (6th Cir. 2007) 497 F.3d 584 ............................................ 21

27 *Melzer v. Board of Education* (2d Cir. 2003) 336 F.3d 185 ......................... 26, 27

28 *Milliken v. Bradley* (1974) 418 U.S. 717 ........................................................... 19

*Monteilh v. County of Los Angeles* (C.D. Cal. 2011) 820 F.Supp.2d 1081......... 25

*Mullenix v. Luna* (2015) __ U.S.__, 136 S.Ct. 305 ............................................. 26

*O'Hare Trucking Service, Inc. v. City of Northlake* (1996) 518 U.S. 712 ......... 23

*Parratt v. Taylor* (1981) 451 U.S. 527.................................................................. 14

*Pickering v. Board of Education* (1968) 391 U.S. 563........................................ 22

*Rosenberger v. Rector & Visitors of Univ. of Va.* (1995) 515 U.S. 819.............. 16

*Rust v. Sullivan* (1991) 500 U.S. 173 .................................................................. 21

*San Antonio Independent School District v. Rodriguez* (1973) 411 U.S. 1......... 19

*Saucier v. Katz* (2001) 533 U.S. 194 ................................................................... 25

*Sloman v. Tadlock* (9th Cir. 1994) 21 F.3d 462................................................... 14

*Tinker v. Des Moines School District* (1969) 393 U.S. 503 ............................... 16

**Statutes**

42 U.S.C. section 1983.......................................................................................... 13

Cal. Ed. Code, § 201 ............................................................................................. 21

Cal. Ed. Code, § 35160 ......................................................................................... 20

Cal. Ed. Code, § 35160.1 ...................................................................................... 20

CUSD Board Policy 0415 ..................................................................................... 24

**Other Authorities**

9th Cir. Model Jury Instruction 9.9....................................................................... 14

**Rules**

F.R.C.P. 56 ............................................................................................................. 12

1  Defendants James Elsasser, Ann O'Connor, and Brenda Hamlett (collectively,
2  the "administrator defendants") respectfully submit the following points and
3  authorities in support of their motion, pursuant to Federal Rule of Civil Procedure 56,
4  for summary judgment or, in the alternative, partial summary judgment:

5  ## I.   **<u>INTRODUCTION</u>**

6  After numerous parents lodged complaints with teachers, principals, and a
7  member of the Board of Education, Claremont Unified School District decided to
8  cancel its field trips to Riley's American Heritage Farms. Plaintiffs allege that this
9  decision was unconstitutional because the parents' complaints arose in response to
10  James Patrick Riley's private political speech on his own personal social media
11  accounts. As demonstrated herein, however, plaintiffs' First Amendment retaliation
12  claims fail as a matter of law.

13  In *Epperson v. State of Arkansas* (1968) 393 U.S. 97, the Supreme Court
14  affirmed that, by and large, "public education in our Nation is committed to the control
15  of state and local authorities," and that federal courts should not ordinarily "intervene
16  in the resolution of conflicts which arise in the daily operation of school systems."
17  (*Id.* at p. 104.) The Supreme Court "has long recognized that local school boards have
18  broad discretion in the management of school affairs" (*Bd. of Ed., Island Trees Union*
19  *Free Sch. Dist. No. 26 v. Pico* (1982) 457 U.S. 853, 863), including – and especially
20  – when it comes to the composition of schools' curriculum. "Whatever role the
21  government might play as a conduit of information, schools in particular ought not be
22  made a slavish courier of the material of third parties." (*Id.* at p. 889 (Burger, C.J.,
23  dissenting).)

24  Plaintiffs cannot produce evidence sufficient to support a prima facie case for
25  First Amendment retaliation. Even if they could, plaintiffs' First Amendment interests
26  are outweighed by CUSD's interest, as a contractor, to ensure that its scholastic
27  activities run efficiently, safely, and to the satisfaction of the students and parents (the
28  District's de facto customers). Finally, even if the Court finds that there is a dispute

of fact as to the balancing of interests, defendants are entitled to qualified immunity, because there was no clearly established law in 2018 informing defendants that it was unconstitutional for them to cancel field trips to which parents objected. For all of these reasons, and as further detailed herein, defendants respectfully request that the Court enter summary judgment. Alternatively, defendants request that the Court summarily adjudicate individual claims, defenses, and/or issues.

## II.    SUMMARY OF UNDISPUTED MATERIAL FACTS

### A.    The Parties

Claremont Unified School District ("CUSD" or "District") is a public K-12 school district located in Los Angeles County. (SUF No. 1.) CUSD is governed by a publicly-elected, five-member Board of Education (the "Board"), in accordance with the California Education Code. (SUF No. 2.) At all relevant times, the members of the Board were defendants Beth Bingham, Hilary LaConte, Steven Llanusa, David Nemer, and Nancy Treser Osgood. (See SUF Nos. 3-7.)

Defendant James Elsasser is employed by CUSD as Superintendent of Schools. (SUF No. 8.) Defendant Ann O'Connor is employed by CUSD as Principal of Chaparral Elementary School. (SUF No. 9.) Defendant Brenda Hamlett is employed by CUSD as Principal of Sumner-Danbury Elementary School. (SUF No. 10.)

Plaintiff James Patrick Riley is a principal shareholder of plaintiff Riley's American Heritage Farms ("Riley's Farm"). (SUF No. 11.) Riley's Farm operates an agritourism business in San Bernardino County, which includes historical reenactment tours. (SUF No. 12.) Riley's Farm markets its historical reenactment tours to public and private schools throughout Southern California as a venue for student field trips. (SUF No. 13.)

### B.    Background on CUSD Field Trips

Plaintiffs allege that, in each school year between 2001 and 2017, students from various schools within the District attended field trips at Riley's Farm. On August 16, 2018, the Board approved a list of vendors for the 2018-2019 school year, which

included Riley's Farm. (SUF No. 14.) District schools were then permitted to choose from among the approved vendors, with each school site booking its own field trips. (SUF No. 15.)

District field trips are arranged and funded through the Parent Faculty Associations at each school site. (SUF No. 16.) Hence, parental input on field trip venue choice has tremendous weight. Moreover, parents have a constitutional and statutory right to be active participants in the education of their children, and this right is reflected in the District's policy encouraging parent input and participation.

### C.     James Patrick Riley's Online Posts Lead to a Controversy Online

On August 30, 2018, certain social media posts from James Patrick Riley's social media accounts went viral. (SUF No. 17.) That day, a person called Elizabeth Adams posted a compilation of Riley's social media posts on her own Facebook page, encouraging others to consider boycotting Riley's Farm as a result of Riley's politically incorrect musings. (SUF No. 18.)

Some examples of Riley's social media posts that drew the public's ire included:

- "What is this country coming to if a girl can't even use her bosoms to smack customers and then sue the president for unwanted sexual advances?" (A reference to pornographic actress and adult entertainer Stormy Daniels' allegations of an extramarital sexual relationship with Donald Trump);

- "When #ElizabethWarren comes on @MSNBC, it's therapeutic to issue a very earthy Cherokee war chant ('hey-ah-hey-ah..etc) I'm doing it right now. I'm running around; I'm treating the various desk lamps like mesquite campfires. You can probably hear it in Oklahoma. #ScotusPick" (A reference to Massachusetts Senator Elizabeth Warren's claim of Native American heritage);

///

- "So I'm planning a high school reunion and I just realized we may have been the last generation born with only two genders." (A reference to transgenderism and gender identity);

- "#NameThatObamaNetflixShow 'Missing ISIS' Heartwarming story of a former Jihad fighter, now readjusting to life as a BLM protester." (A comparison between the Black Lives Matter movement and the ISIS terrorist organization);

- "#Disappointmentin4Words We honor EBT Cards" (A reference to persons receiving welfare);

- "Isn't it strange how #Teachers are considered the most noble people in the world until it comes time to consider arming them? Then they become all sorta sketchy? #JoinTheNRA" (Advocating teachers carrying firearms in the classroom);

- "White supremacy? You mean those 3 guys who live in two different counties in Arkansas? If there's a problem in American today, it's BLACK supremacy. Farrakhan, Obama, Lebron James, etc. Typical brain dead feminist.." (Making light of white supremacy and instead focusing on the perceived threat of black supremacy); and

- "I believe they are going to call this 'Play Hookie and be a P*ssy' Day." (In response to news of student protests in response to the school shooting in Parkland, Florida).

(See SUF Nos. 19-26.) According to news reports, Elizabeth Adams' initial post regarding Riley's tweets was shared by at least 1300 other Facebook users within the next few days. (See Request for Judicial Notice, Exh. F.)

### D.   Parents Complain to CUSD about Riley's Farm Field Trips

Later on August 30, 2018 (the same day that Elizabeth Adams posted about Riley's tweets), a parent of a Kindergarten student at Chaparral Elementary School sent an email to Chaparral Kindergarten teacher Michelle Wayson, expressing the

parent's concern over the tweets. (SUF No. 27.) The parent's email included screen shots of the tweets themselves, as well as screenshots from Riley's blog site, where Riley had composed an essay entitled "Jim Crow for White Daddies." (O'Connor Decl., Exh. E.)

In the body of her email, the parent wrote:

> I am writing to ask you for a bit more information about the upcoming field trip to Riley's Apple Farm. … As you know, my son… is black; and I do NOT feel comfortable with my son patronizing an establishment whose owner (and/or family/employees) might be inclined to direct bigoted opinions towards my child or other vulnerable children in the group. … Would it be possible to have the field trip moved to another Oak Glen apple farm, like Annie's Apples or another establishment? If not, will [the student's] grade be negatively affected if we opt to not allow him to participate in the field trip?

(*Ibid.*)

Wayson immediately shared the parent's email with Chaparral Principal Ann O'Connor. (SUF No. 28.) Wayson informed O'Connor that all four of Chaparral's Kindergarten classes were planning to attend a joint field trip to Riley's Farm for an apple picking tour on October 17, 2018. (SUF No. 29.) O'Connor assisted Wayson in preparing a response to the parent's email, assuring the parent that Chaparral took her concerns seriously and would look into the matter right away. (SUF No. 30.) O'Connor then asked Wayson to discuss the parent's concerns with the other three Chaparral Kindergarten teachers and determine whether alternative field trip venues would be more appropriate for the joint Kindergarten class field trip. (SUF No. 31.)

Meanwhile, Sumner Danbury Elementary School Principal Brenda Hamlett received verbal communications from multiple parents of Sumner Danbury students, expressing similar concerns regarding Sumner Danbury's field trip to Riley's Farm. (SUF No. 32.) These parents communicated to Hamlett their desire that their children be excused from attending Riley's Farm field trips and/or that their children's classes choose an alternative field trip venue. (SUF No. 33.)

On or about September 2, 2018, Lee Kane, a District resident whose children attended CUSD schools, shared Elizabeth Adams' Facebook post to District Board member David Nemer, asking whether the District sent field trips to Riley's Farm and expressing concerns regarding such field trips in light of the public controversy surrounding Riley's tweets. (SUF No. 34.) Other District residents and/or parents also commented on that post, expressing similar concerns. (SUF No. 35.)

On September 2, 2018, Nemer emailed CUSD Superintendent James Elsasser to notify him of the Facebook post by Elizabeth Adams and the concern it was apparently causing among District parents and residents. (SUF No. 36.) The purpose of Nemer's email was to make Elsasser aware of the controversy in anticipation that parents might approach him regarding the controversy when he returned to the office on September 4, 2018. (SUF No. 37.) Elsasser responded that he would discuss the parents' concerns with his Executive Cabinet on September 4. (SUF No. 38.)

**E.    CUSD Schools Cancel Riley's Farm Field Trips in Response to Parent Complaints**

On the morning of September 4, 2018, Elsasser met with his Executive Cabinet to discuss – among other topics – parent concerns regarding field trips to Riley's Farm. (SUF No. 39.) Later the same day, the K-12 administrators for all of CUSD met for a regularly-scheduled meeting. (SUF No. 40.) Among other topics, one of the matters discussed in this K-12 administrators' meeting were parent concerns that many of the administrators had been made aware of regarding field trips to Riley's Farm. (SUF No. 41.) Elsasser asked each of the school site administrators to speak with their teachers and determine whether any of them maintained a desire to attend field trips to Riley's Farm. (SUF No. 42.)

Based on the parent concerns expressed in the August 30, 2018, email received by Wayson, as well as the other parent concerns reported by K-12 administrators at the September 4 meeting, O'Connor emailed all four Chaparral Kindergarten teachers on September 4, 2018, instructing them that "[w]e need to find another alternative,"

i.e., a different field trip venue that does not cause concerns from parents. (SUF No. 43.)

By September 10 – six days after Elsasser had instructed the K-12 administrators to ask their staff whether they maintained an interest in attending Riley's Farm field trips – no administrator, teacher, or staff member expressed to Elsasser a desire to continue going to Riley's Farm. (SUF No. 44.) Since there was apparently no interest in going to Riley's Farm, CUSD Assistant Superintendent for Educational Services Julie Olesniewicz sent the following email on September 10, 2018, to the principals of each of the CUSD elementary schools:

> We discussed Riley's Farm today in Cabinet. We have researched as much as we possibly can, and the only farm in Oak Glen that we can directly link to James Patrick Riley is the actual Riley's Farm. There are many other farms up there that are owned and run by other members of the Riley family, but don't seen to be linked to him. Therefore, we are asking that no CUSD school attend Riley's Farm field trips. However, other farms such as Los Rios Rancho and Stone Soup Farm should be fine as it does not appear that James Patrick Riley is involved in those farms.

(SUF No. 45.)

## F. Plaintiffs' Counsel Threatens to Sue, and the District's General Counsel Responds

On September 24, 2018, Thomas Eastmond, counsel for Riley's Farm and Riley, sent a letter to the District, threatening civil litigation if the District did not immediately agree to his clients' settlement demands, which included: (1) reinstatement of all District field trips to Riley's Farm; (2) issuance of an apology letter; (3) adoption of a formal policy barring District personnel from retaliating against independent contractors for their free speech; and (4) reimbursement of all legal fees incurred by Riley's Farm. (SUF No. 46.)

Eastmond's letter was referred to the District's general counsel, Cathie Fields of the law firm Atkinson, Andelson, Loya Ruud & Romo. (SUF No. 47.) On October

11

2, 2018, Fields sent a letter to Eastmond, in which she expressed strong disagreement with the factual and legal assertions in Eastmond's September 24, 2018, letter. (SUF No. 48.) Fields explained: "The District's purpose in conducting field trips is to provide educational experiences for students, not to expose them to inappropriate sexist or racist attitudes." (Modafferi Decl., Exh. H.) Fields then posited that Riley had no constitutional right to dictate to the District the content of its curriculum. (*Ibid.*) Finally, Fields rejected Eastmond's settlement demands. (*Ibid*.)

Ten days later, on October 12, 2018, plaintiffs filed their civil complaint in this action, alleging causes of action for First Amendment retaliation, conspiracy to retaliate in violation of the First Amendment, and injunctive relief.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment serves to isolate and dispose of factually unsupported claims. (*Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 323-324.) Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (F.R.C.P. 56(c); *Celotex Corp. v. Catrett, supra*, 477 U.S. at p. 322.) The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which the nonmoving party has the burden of proof. (*Id.* at pp. 322-23.) A party opposing summary judgment may not rest upon mere allegations or denials of pleadings, but must set forth specific facts showing that there is a genuine issue for trial. (*Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 248.) A party may move for summary judgment as to individual parts of a complaint or a part of a claim or defense in the pleadings. (F.R.C.P. 56(a).)

The moving party may satisfy its initial burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to

1    establish an element of its claim on which that party will bear the burden of proof at

2    trial. (*Celotex Corp. v. Catrett, supra,* 477 U.S. at pp. 322-23.) If the moving party

3    meets the initial burden, the burden shifts to the nonmoving party to "set forth specific

4    facts showing there is a genuine issue for trial." (*Anderson v. Liberty Lobby, Inc.,*

5    *supra*, 477 U.S. at p. 256.) A fact is material only if proof of that fact would establish

6    or refute one of the elements of a claim or affirmative defense at issue, and only

7    disputes over facts that might affect the outcome of the suit under the governing law

8    will properly preclude the entry of summary judgment. (*Ibid.*)

9    **IV.   PLAINTIFFS CANNOT PRODUCE EVIDENCE SUFFICIENT TO**

10   **SUPPORT A PRIMA FACIE CLAIM FOR FIRST AMENDMENT**

11   **RETALIATION AGAINST THE ADMINISTRATOR DEFENDANTS**

12   Plaintiffs' operative, first amended complaint alleges three causes of action, all

13   of which are brought pursuant to 42 U.S.C. section 1983. Section 1983 provides, in

14   relevant part:

15   Every person who, under color of any statute, ordinance, regulation,
     custom, or usage, of any State or Territory or the District of Columbia,
16   subjects, or causes to be subjected, any citizen of the United States or
     other person within the jurisdiction thereof to the deprivation of any
17   rights, privileges, or immunities secured by the Constitution and laws,
     shall be liable to the party injured in an action at law, suit in equity, or
18   other proper proceeding for redress….

19

20   Thus, according to the Ninth Circuit, "the requirements for relief under [§] 1983 have

21   been articulated as: (1) a violation of rights protected by the Constitution or created

22   by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under

23   color of state law." (*Crumpton v. Gates* (9th Cir. 1991) 947 F.2d 1418, 1420.)

24   In this case, there is no dispute that the administrator defendants – all of whom

25   are natural persons who have been sued in their individual capacities – are "persons"

26   within the meaning of Section 1983. Similarly, to the extent plaintiffs allege that

27   defendants' liability arises from acts or omissions occurring in the course of their

28   employment at CUSD, the administrator defendants concede that they were acting

---
13

1   "under color of state law." Therefore, the only elements at issue are (1) whether any
2   plaintiffs' rights under the First Amendment were violated, and (2) whether that
3   violation was proximately caused by any of the administrator defendants. As
4   demonstrated below, plaintiffs cannot produce evidence sufficient to establish these
5   prima facie elements of their Section 1983 causes of action.

6       **A.**    **Plaintiffs Cannot Produce Evidence That Any of the Administrator**
7                 **Defendants Intended to Chill James Patrick Riley's Political Speech**

8       Courts apply varying state-of-mind requirements to Section 1983 claims,
9   depending on the Constitutional right the plaintiff alleges the defendant violated.
10  While Section 1983 itself imposes no independent state-of-mind requirement (*Parratt*
11  *v. Taylor* (1981) 451 U.S. 527, 534), "the state of mind of the defendant may be
12  relevant on the issue of whether a constitutional violation has occurred in the first
13  place." (*Baker v. McCollan* (1979) 443 U.S. 137, 140.)

14      In a case alleging First Amendment retaliation, the plaintiff must plead and
15  prove that each of the defendants was substantially motivated by a desire to deter or
16  chill the plaintiff's speech. (*Awabdy v. City of Adelanto* (9th Cir. 2004) 368 F.3d 1062,
17  1071; *Sloman v. Tadlock* (9th Cir. 1994) 21 F.3d 462, 1465, n. 10; see also 9th Cir.
18  Model Jury Instruction 9.9.) The plaintiff in *Awabdy* alleged that false criminal
19  charges were initiated against him, in retaliation for his political activities as a City
20  Councilmember in Adelanto, which had caused significant conflicts with other
21  members of the City Council. The Ninth Circuit held that "[t]o establish that his First
22  Amendment rights were violated, Awabdy must prove that chilling his political
23  speech was a substantial or motivating factor in the defendants' wrongful conduct."
24  (368 F.3d at p. 1071.) Similarly, in this case, in order for plaintiffs' First Amendment
25  retaliation claim to proceed to trial, plaintiffs bear the burden of producing admissible
26  evidence which, if credited by the jury, would prove that chilling James Patrick
27  Riley's online speech was a substantial or motivating factor in the administrator
28  defendants' decision to cancel field trips to Riley's Farm. Plaintiffs cannot present

14

such evidence, and therefore, summary judgment should be granted.

The undisputed facts clearly establish that CUSD canceled its field trips to Riley's Farm in response to parent complaints. It is not sufficient that Riley's speech was a "but-for" cause of the cancellation. The key element is retaliatory intent – of which there is no evidence.

On August 30, 2018 – the same day that Riley's tweets went viral online – a parent of a Kindergarten student complained to her son's teacher. Having read Riley's posts which compared Black Lives Matter to terrorism, denounced what Riley perceives as "BLACK supremacy" on the part of such mainstream figures as Barack Obama and LeBron James, and downplayed the seriousness of white supremacy, the parent reported that she "d[id] NOT feel comfortable with [her] son," who is Black, attending a field trip to Riley's Farm. The parent asked, "Would it be possible to have the field trip moved to another Oak Glen apple farm, like Annie's Apples or another establishment? If not, will [the student's] grade be negatively affected if we opt to not allow him to participate in the field trip?"

Upon receiving the parent's complaint, Michelle Wayson consulted her Principal immediately. Ann O'Connor discussed the parent's concerns with Wayson, helped her craft a response to the parent, and instructed the four Kindergarten teachers to begin consider whether alternative field trip venues would be more appropriate. A few days later, after finding out at the K-12 administrators' meeting that other administrators had received similar complaints from parents, O'Connor decided definitively that the Chaparral Kindergarten class would need to find an alternative field trip venue. The evidence is indisputable that this decision was based on parent complaints, not a desire to chill Riley's speech on social media (which remained unaffected).

For his part, James Elsasser never instructed any of the K-12 administrators that their schools were not permitted to attend Riley's Farm field trips. Rather, Elsasser asked the administrators to speak with their staff members and determine whether any

of them maintained a desire to attend Riley's Farm field trips, in spite of the parents' complaints. Not a single staff member, teacher, or administrator advised Elsasser that they wanted to attend Riley's Farm. Therefore, the discussion ended there.

There simply is no admissible evidence on which a reasonable jury could conclude that any of the administrator defendants acted out of an intent to chill James Patrick Riley's speech. Defendants simply made a curriculum decision in response to parent input. Therefore, plaintiffs cannot make out a prima facie case.

**B.** **Even if Plaintiffs Could Make out a Prima Facie Case That Defendants Were Retaliating against James Patrick Riley's Speech, A Public School's Choices in Designing Its Curriculum – Which Necessarily Includes Choice of Field Trip Venues – Do Not Implicate the First Amendment**

"In the First Amendment context, public schools present a unique setting." (*Esquivel v. San Francisco Unif. Sch. Dist.* (N.D. Cal. 2008) 630 F.Supp.2d 1055, 1059.) In *Tinker v. Des Moines School District* (1969) 393 U.S. 503, the Supreme Court noted that it has "repeatedly emphasized... the comprehensive authority of the States and of school officials... to prescribe and control conduct in the schools." (*Id.* at p. 507.) The Court has also acknowledged that public schools are vitally important "in the preparation of individuals for participation as citizens," and as vehicles for "inculcating fundamental values necessary to the maintenance of a democratic political system." (*Amback v. Norwick* (1979) 441 U.S. 68, 76-77.)

In *Rosenberger v. Rector & Visitors of Univ. of Va.* (1995) 515 U.S. 819, the plaintiffs claimed that a public university unconstitutionally refused funding to a student group because it had a religious purpose. In its discussion, the Court noted:

> When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker *or when it enlists private entities to convey its own message*.

5:18-cv-02185-JGB-SHK

(*Id.* at p. 833 (emphasis added).) The Court concluded that the University is free to "take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted." (*Ibid.*) Similarly, in *Arkansas Educational Television Commission v. Forbes* (1998) 523 U.S. 666, the Supreme Court provided several examples of discretionary decisions by schools which do not implicate the First Amendment, including: "a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum." (*Id.* at p. 674.)

In *Downs v. Los Angeles Unified Sch. Dist.* (9th Cir. 2000) 228 F.3d 1003, a teacher at a public high school sought to post materials on a school bulletin board which reflected a differing viewpoint to the school's gay and lesbian awareness month. The Ninth Circuit summarized the teacher's argument and its rejection thereof succinctly:

> The narrow question we must answer is whether the First Amendment compels a public high school to share the podium with a teacher with antagonistic and contrary views when the school speaks to its own constituents on the subject of how students should behave towards each other while in school. The answer to this question clearly is no.

(*Id.* at p. 1005.) Because the bulletin board constituted government speech, the school district was permitted to discriminate against the teacher based on viewpoint. (*Id.* at p. 1011 ("Viewpoint neutrality… does not apply to LAUSD's actions in this case.").)

In disagreeing with defendants' government speech argument at the motion to dismiss stage, the Court noted that none of the government speech cases cited by defendants involved allegations of retaliation, and therefore, the Court declined to dismiss plaintiffs' retaliation claims at that time. Importantly, however, the Courts of Appeals have applied the government speech cases in several First Amendment retaliation cases arising in the context of curricular speech in public schools. In *Johnson v. Poway Unified School District* (9th Cir. 2011) 658 F.3d 954, for example, a high school math teacher was threatened with adverse employment consequences

17

unless he removed posters from his classroom containing religiously-themed, patriotic messages, such as "IN GOD WE TRUST"; "ONE NATION UNDER GOD"; "GOD BLESS AMERICA"; and, "GOD SHED HIS GRACE ON THEE." (*Id.* at p. 958.) The removal order had been precipitated by complaints from two fellow teachers and one student, who contended that the posters could alienate students whose religious views differed from the teacher's. (*Ibid.*) Citing *Downs*, *supra*, the Ninth Circuit concluded "that there is no legitimate question as to whether the school violated Johnson's rights—it did not." (*Id.* at p. 964.)

Similarly, in *Evans-Marshall v. Board of Education* (6th Cir. 2010) 624 F.3d 332, a public school teacher's contract was not renewed after parents objected to the books the teacher had assigned to her students. The Sixth Circuit affirmed summary judgment in favor of the school district, observing that "[t]he Constitution does not prohibit a State from creating elected school boards and from placing responsibility for the curriculum of each school district in the hands of each board." (*Id.* at p. 341.) "Could a teacher continue to assign materials that members of the community perceive as racially insensitive even after the principal tells her not to?", the Sixth Circuit asked. (*Ibid.*) Certainly not. To rule otherwise "would transform run-of-the-mine curricular disputes into constitutional stalemates." (*Ibid.*) "Because 'one man's vulgarity is another's lyric,' *Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), or, as one school board member put the point at the November 2001 meeting, 'what you might find offensive, I might not,' [Citation], parents long have demanded that school boards control the curriculum and the ways of teaching it to their impressionable children. Permitting federal courts to distinguish classroom vulgarities from lyrics or to pick sides on how to teach *Siddhartha* not only is a recipe for disenfranchising the 9,000 or so members of the Tipp City community but also tests judicial competence." (*Id.* at p. 342.)

Likewise, in *Boring v. Buncombe County Bd. of Ed.* (4th Cir. 1998) 136 F.3d 364, a teacher was transferred out of her high school in retaliation for her class putting

on a play that the school district deemed inappropriate. In an en banc ruling, the Fourth Circuit affirmed the District Court's dismissal of the teacher's claim for First Amendment retaliation, holding that "the school, not the teacher, has the right to fix the curriculum." (*Id.* at p. 370.)

In *Chiras v. Miller* (5th Cir. 2005) 432 F.3d 606, the author of a textbook sued the Texas State Board of Education after the Board refused to place his textbook on a list of textbooks approved for use in classrooms throughout the state. The textbook at issue had initially been recommended for approval by the Board, but approval was ultimately denied after two "conservative think-tank organizations" voiced their displeasure with the textbook. (*Id.* at pp. 609-610.) The textbook author then sued the Board, alleging that the Board's decision constituted impermissible viewpoint discrimination in violation of the Free Speech Clause of the First Amendment. (*Id.* at p. 610.)

The Fifth Circuit affirmed the district court's order dismissing the textbook author's First Amendment claim under Rule 12(b)(6). The appellate court began its analysis by observing that "the states enjoy broad discretionary powers in the field of public education. Central among these discretionary powers is the authority to establish public school curricula which accomplish[ ] the states' educational objectives." (*Id.* at p. 611 (citing *Bd. of Ed. v. Pico*, *supra*, 457 U.S. at p. 864).)

> In *Milliken v. Bradley,* 418 U.S. 717, 741, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), Chief Justice Burger wrote: "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." Similarly, in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 50, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Court observed that local control over the educational process affords citizens an opportunity to participate in decision making, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation, and a healthy competition for educational excellence."

(*Ibid.*) Relying on these precedents, the Fifth Circuit held: "[I]n establishing and implementing certain governmental functions, the government, including its educational institutions, has the discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement." (*Id.* at p. 613.) Furthermore, the court held that "the government retains this discretion even where it chooses to employ private speakers to transmit its message." (*Ibid.*) The court therefore concluded:

> [W]hen the [Board] devises the state curriculum for Texas and selects the textbook with which teachers will teach to the students, it is the state speaking, and not the textbook author. Designing the curriculum and selecting textbooks is a core function of the [Board]. It is necessary for the Board to exercise editorial judgment over the content of the instructional materials it selects for use in the public school classrooms, and the exercise of that discretion will necessarily reflect the viewpoint of the Board members. The purpose of the Board is not to establish a forum for the expression of the views the various authors of textbooks and other instructional materials might want to interject into the classroom. The Board does not encourage a "diversity of views," …but instead "enlists private entities to convey its own message." Further, the Board has a statutory obligation under Texas law to exercise that discretion in order to promote the state's chosen message through the Board's educational policy. [¶] Because the Board must necessarily exercise its editorial discretion in selecting which private entities will convey the message the state selects, forum analysis and the viewpoint neutrality requirement are inapposite in this case. As a result, there is no forum to which Appellant Chiras can claim access as a textbook author.

(*Id.* at pp. 614-615.)

The choice of a field trip venue is a fundamental part of curriculum design, just as the choice of approved textbooks was in *Chiras*. Like the Texas law cited by the Fifth Circuit, the California Education Code vests local school districts with the statutory discretion to "initiate and carry on any program [or] activity" – including field trips – which the school districts deem "necessary or desirable in meeting their needs." (Cal. Ed. Code, §§ 35160-35160.1.) The First Amendment undoubtedly guarantees Mr. Riley's right to speak on matters of public concern, just as it

guaranteed Chiras' right to write and publish his textbook. However, the First Amendment does not guarantee a right to have a public school district patronize a private business, whether that business is a field trip venue or a textbook publisher.

The Supreme Court's holding in *Rust v. Sullivan* (1991) 500 U.S. 173 is also instructive. In that case, the Court addressed the federal government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning counseling, which the petitioners claimed impermissibly discriminated based on viewpoint. The Court held that the prohibition was permissible under the First Amendment, because:

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program…. In doing so, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other. A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.

(*Id.* at p. 193.)

Defendants fully understand and respect that plaintiffs must be allowed to engage in free expression and dissemination of their viewpoints, even when those viewpoints are uncomfortable, unpopular, or uncouth. However, public school administrators have an equally important interest in maintaining an environment that is helpful – and not harmful – to learning. "School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." (*Lowery v. Euverard* (6th Cir. 2007) 497 F.3d 584, 596.) In fact, California school districts are required by law "to minimize and eliminate a hostile environment on school grounds that impairs the access of pupils to equal educational opportunity." (Cal. Ed. Code, § 201, subd. (f).)

In this case, the two competing rights can coexist – Mr. Riley can continue to post his political views online to his heart's content, and CUSD administrators can simultaneously maintain and exercise their statutory discretion to choose a field trip

21

5:18-cv-02185-JGB-SHK

venue that best suits the needs of CUSD students. As the plurality noted in *Pico*, *supra*, "local school boards must be permitted 'to establish and apply their curriculum in such a way as to transmit community values,' and… 'there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political.'" (457 U.S. at p. 864.) The CUSD administrators' decision in this regard simply does not implicate the First Amendment. Therefore, the administrator defendants are entitled to judgment as a matter of law.

## V.   EVEN IF PLAINTIFFS COULD DEMONSTRATE PRIMA FACIE FIRST AMENDMENT RETALIATION, LEGITIMATE GOVERNMENTAL INTERESTS OUTWEIGH PLAINTIFFS' FIRST AMENDMENT HARM

Even if plaintiffs could produce evidence sufficient to support a prima facie case for First Amendment retaliation, defendants are entitled to judgment as a matter of law if the Court determines that, under the balancing test articulated in *Pickering v. Board of Education* (1968) 391 U.S. 563, legitimate governmental interests in promoting efficient services outweigh the plaintiffs' free speech interests. (*Alpha Energy Savers, Inc. v. Hansen* (9th Cir. 2004) 381 F.3d 917, 923.) At the motion to dismiss stage, the Court held that *Pickering* balancing was inapplicable to plaintiffs' retaliation claims in this case, because plaintiffs' provision of field trip services to CUSD does not fall within the category of services traditionally provided by the government, and therefore, plaintiffs were entitled to increased protection from retaliation, similar to that of private citizens. (See ECF No. 34.) With the factual record now developed, defendants urge the Court to revisit this determination for two key reasons.

First, assuming the relevant test is whether the contractor provides services traditionally performed by government, the hosting of public school field trips certainly falls within this category. A field trip is an extension of the classroom,

allowing students to gain a broader perspective on the lessons their teachers teach them during regular school days. For example, Riley's Farm's Revolutionary War Adventure program is typically visited by fifth graders, in conjunction with their study of American History. Teaching students history (whether through books in the classroom or through live historical reenactments) is precisely the type of governmental service that public schools exist to provide. The fact that they contract that responsibility out to Riley's Farm for one day out of the year does not render Riley's Farm any less a provider of a traditional governmental service. Certainly, the service provided by Riley's Farm is closer to the core purpose of CUSD than a contract for towing services was to the city in *O'Hare Trucking Service, Inc. v. City of Northlake* (1996) 518 U.S. 712.

Second, defendants do not agree that the nature of the service provided by the contractor should be determinative in deciding whether or not *Pickering* balancing should apply. Rather, the core inquiry is whether the allegedly retaliatory act constitutes the termination of a contractual relationship or the exercise of sovereign power to the detriment of the plaintiff. This is illustrated by the fact that the courts have included prospective contractors under the balancing analysis – their injury is the refusal of the contract, not some unrelated punishment meted out by the government in its capacity as sovereign.

It is also notable that the Supreme Court in *O'Hare* viewed its ruling as an extension of *protection* to contractors. Were it not for *O'Hare* and its progeny, independent contractors would not have been treated as "private citizens" and thereby given a higher degree of First Amendment protection for the retaliatory termination of their contract – they would have received no protection at all. The same is true for prospective contractors in circuits that have not extended the balancing analysis to them: if the government refuses them a contract in retaliation for their speech, there is no First Amendment harm whatsoever.

///

23

5:18-cv-02185-JGB-SHK

1    In this case, the allegedly unconstitutional action on the part of defendants was
2  the termination of the contractual relationship between Riley's Farm and CUSD.
3  There is no evidence – indeed, no allegation – that any of the defendants attempted to
4  exert CUSD's sovereign authority to regulate Riley's speech or otherwise punish
5  plaintiffs by some means other than the termination of the contract. Therefore, the
6  Court must weigh the constitutional harm arising from the termination of the contract
7  against CUSD's legitimate interests, as contractor, in providing efficient educational
8  services.

9    The scale tips heavily in favor of defendants due to their legitimate interest in
10  designing curricular programs that meet with parent approval, rather than complaints
11  from parents. The parent of a Black Kindergartner complained that she did not feel
12  her son would be in a safe environment at Riley's Farm. Numerous other parents
13  complained verbally and on social media – to principals and even one member of the
14  Board. Furthermore, parents literally control the purse strings on field trips, which are
15  funded through the Parent Faculty Associations.

16    According to defendants' expert, Victor P. Hayek, it is consistent with standard
17  practices in public education for public school administrators, such as defendants, to
18  exercise discretion in selecting venues for field trips using input from
19  parents/guardians. (SUF No. 56.) Indeed, given CUSD's commitment to equitable
20  access, support services, and opportunities for success in a positive school climate
21  (see Board Policy 0415), it is Dr. Hayek's opinion that emails and other
22  communications from parents who are concerned about a school activity should cause
23  school and District administrators to evaluate their choice of program(s).

24    The loss of CUSD's business no doubt causes some measure of harm to
25  plaintiffs. However, that harm is of no greater character than the harm that plaintiffs
26  would incur if a private school canceled field trips in response to parent complaints.
27  Clearly, public school administrators' interest in choosing programs that are safe,
28  effective, and consistent with parental demands outweighs the minimal harm to

1  plaintiffs.

2  **VII.  DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY,**
3  **BECAUSE A REASONABLE PUBLIC SCHOOL ADMINISTRATOR IN**
4  **DEFENDANTS' POSITION COULD HAVE BELIEVED THAT IT WAS**
5  **LEGAL TO CANCEL THE RILEY'S FARM FIELD TRIPS IN**
6  **RESPONSE TO PARENT COMPLAINTS**

7  Even if plaintiffs could produce evidence sufficient to support a prima facie
8  claim for First Amendment retaliation, and their First Amendment injury were not
9  outweighed by legitimate governmental interests, defendants are entitled to qualified
10  immunity. "Qualified immunity shields public officials sued in their individual
11  capacity for monetary damages, unless their conduct violates 'clearly established' law
12  that a reasonable public official would have known." (*Monteilh v. County of Los
13  Angeles* (C.D. Cal. 2011) 820 F.Supp.2d 1081, 1087.) The Supreme Court has
14  established a two-part analysis for determining whether qualified immunity is
15  appropriate in a suit against a public employee for an alleged violation of a
16  constitutional right. (*Saucier v. Katz* (2001) 533 U.S. 194, 201.) Under *Saucier*, courts
17  "must examine first whether the officers violated plaintiff's constitutional rights on
18  the facts alleged and, second, if there was a violation, whether the constitutional rights
19  were clearly established." (*Desyllas v. Bernstine* (9th Cir. 2003) 351 F.3d 934, 939.)

20  To be clearly established, the "contours of the right must be sufficiently clear
21  that a reasonable official would understand that what he is doing violates that right."
22  (*Anderson v. Creighton* (1987) 483 U.S. 635, 640.) There must be "some parallel or
23  comparable fact pattern to alert an officer that a series of actions would violate an
24  existing constitutional right." (*Fogel v. Collins* (9th Cir. 2008) 531 F.3d 824, 833.) If
25  public employees of reasonable competence could disagree on the issue, immunity
26  should be recognized. (*Hope v. Pelzer* (2002) 536 U.S. 730, 741.) "We do not require
27  a case directly on point, but *existing precedent* must have placed the statutory or
28  constitutional question *beyond debate*. Put simply, qualified immunity protects all but

1   the plainly incompetent or those who knowingly violate the law." (*Mullenix v. Luna*
2   (2015) __ U.S.__, 136 S.Ct. 305, 308 (emphasis added).)

3       There simply was no existing precedent at the time CUSD canceled its Riley's
4   Farm field trips which would have placed defendants on notice that they were
5   constitutionally prohibited from canceling field trips in response to parent complaints.
6   Rather, the overwhelming weight of the case law favors discretion for public school
7   administrators.

8       As discussed above, there is extensive case law in the government speech arena
9   establishing that schools have plenary authority over their curricula, and that
10  curricular choices are not justiciable. Certainly, none of those cases would have
11  forewarned defendants that they would run afoul of the First Amendment by canceling
12  field trips in response to parent complaints.

13      The Second Circuit's decision in *Melzer v. Board of Education* (2d Cir. 2003)
14  336 F.3d 185 did not provide any such notice to defendants, either. The plaintiff in
15  *Melzer* was a high school science teacher with over 30 years' tenure. Despite his
16  decades of effectively teaching science to grades 9 through 12, the plaintiff was
17  suspended and ultimately terminated after students' parents learned that the teacher
18  was a member of the North American Man/Boy Love Association ("NAMBLA"). (*Id.*
19  at p. 189.) The record showed no evidence that the teacher ever engaged in any illegal
20  or inappropriate conduct with students or that the actual content of his science
21  curriculum reflected his views on pedophilia. (*Ibid.*) Nevertheless, the school
22  terminated the teacher based on his political affiliation and the resulting uproar from
23  parents of students.

24      The Second Circuit observed that the teacher's First Amendment rights of
25  association and speech are not "on a different constitutional value scale than other
26  types of First Amendment rights more widely accepted by society." (*Id.* at p. 197.)
27  Nevertheless, the court noted that the plaintiff's position as a public school teacher
28  merited special consideration in balancing the opposing interests at stake:

> [W]e note that we conduct our evaluation of appellant's rights versus
> governmental interest bearing in mind his position as a teacher in a
> public school. ***This position by its very nature requires a degree of
> public trust not found in many other positions of public employment.***
> Although we recognize the danger in allowing the government to take
> action against an employee for his off-duty affiliations, in the context
> of teaching schoolchildren Melzer's activities strike such a sensitive
> chord that, despite the protection afforded his activities, the disruption
> they cause is great enough to warrant the school's action against him.

(*Id.* at p. 198 (emphasis added).)

Based on all of these considerations, the court held that the actual or potential

disruptions to school activities as a result of the teacher's political affiliation

outweighed his constitutional interests:

> Parents so concerned may remove their children from the school,
> thereby interrupting the children's education, impairing the school's
> reputation, and impairing educationally desirable interdependency and
> cooperation among parents, teachers, and administrators.

(*Id.* at p. 199.) The court therefore affirmed the judgment in favor of the school.

According to Victor Hayek, CUSD's choice to cancel its Riley's Farm field

trips was consistent with standard practices in public education to ensure that student

programs are consistent with and do not disrupt the District's educational mission.

(SUF Nos. 58-60.) Furthermore, Dr. Hayek – himself a credentialed public school

administrator – believes that a reasonable California public school administrator in

any of the defendants' position would have believed that it was within their lawful

authority to choose an alternative field trip venue in response to parents'/guardians'

and community members' concerns. (SUF No. 62.)

Finally, qualified immunity is clearly supported by the fact that administrators

at several other public school districts made similar decisions to cancel field trips in

response to parent complaints over Riley's tweets. Unless the Court believes that

public school administrators throughout Southern California were all unreasonably

canceled their field trips despite actual or constructive knowledge that the cancelation

constituted a clearly established violation of the First Amendment, then there can be

1   no other conclusion than that defendants are entitled to qualified immunity.

2   **VIII.   PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES**

3          Finally, plaintiffs' operative complaint contains a prayer for punitive damages

4   against the administrator defendants. To obtain punitive damages, a plaintiff must

5   prove that a defendant's actions were malicious, oppressive, or in reckless disregard

6   of the plaintiff's rights. (*Dang v. Cross* (9th Cir. 2005) 422 F.3d 800, 810.) Here, there

7   is no evidence of malice, oppression, or reckless disregard toward plaintiffs on the

8   part of any of the administrator defendants. CUSD administrators made a good faith

9   assessment of their authority – an assessment that was confirmed by the District's

10  general counsel after-the-fact. Moreover, the stakes were relatively low, as plaintiffs

11  were not physically injured or even deprived of their right to free expression. Even if

12  the Court finds that there is a triable issue of fact as to whether or not defendants made

13  an unconstitutional decision, there simply is no evidence that any of the defendants

14  made that decision maliciously, oppressively, or in reckless disregard for plaintiffs'

15  rights. Therefore, plaintiffs' claim for punitive damages must be dismissed.

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## IX.    **CONCLUSION**

The Constitution affords public school administrators broad discretion to determine what curricular programs best suit the needs of students and their parents. CUSD's decision to cancel field trips to Riley's Farm falls within that discretion. Alternatively, no clearly established law placed defendants on notice that their choice of a field trip venue had Constitutional implications. For all of these reasons, defendants respectfully request that the court grant summary judgment or, in the alternative, partial summary judgment.

Dated: June 8, 2020                              Meyers Fozi & Dwork, LLP


                                       By:    /s/ Daniel S. Modafferi
                                              Golnar J. Fozi
                                              Daniel S. Modafferi
                                              Attorneys for Defendants,
                                              James Elsasser, Steven Llanusa, Hilary
                                              LaConte, Beth Bingham, Nancy Treser
                                              Osgood, David Nemer, Ann O'Connor,
                                              and Brenda Hamlett

5:18-cv-02185-JGB-SHK